**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**VISION-PARK PROPERTIES and
VISION BANK,**

        **Appellants,**

**v.**                            **CASE NO.  3:12-cv-511-MW/EMT**

**SEASIDE ENGINEERING &
SURVEYING, INC.,**

        **Appellee.**

_____/

**ORDER AFFIRMING BANKRUPTCY COURT'S ORDER CONFIRMING
AMENDED PLAN OF REORGANIZATION OF SEASIDE ENGINEERING
& SURVEYING, INC. AS MODIFIED BY THE TECHNICAL
<u>AMENDMENT TO THE AMENDED PLAN</u>**

Vision–Park Properties, LLC and SE Property Holdings, LLC, successor by

merger to Vision Bank (collectively "Vision") have filed an appeal challenging the

Bankruptcy Court's confirmation of Seaside Engineering & Surveying, Inc.'s

("Debtor") Chapter 11 Amended Plan of Reorganization of Seaside Engineering &

Surveying, Inc,[1] as Modified by the Technical Amendment to the Amended Plan.[2]

---

[1]     ECF No. 14, Docket 339.  The Bankruptcy Appeal Record was filed with this Court in separate ECF entries: ECF No. 11, containing Bankruptcy Docket numbers in the range of 1 through 134; ECF No. 12, containing Bankruptcy Docket numbers in the range of 137 through 232; ECF No. 13, containing Bankruptcy Docket numbers in the range of 233 through 265; ECF No. 14, containing Bankruptcy Docket numbers in the range of 266 through 341; and ECF No. 15, containing Bankruptcy Docket numbers in the range of 342 through 480.  ECF No. 16 contains the Bankruptcy Docket sheet listing all of the docket filings before the Bankruptcy

ECF No. 15, Docket 451.  Before this Court is Vision's Initial and Reply Briefs, ECF Nos. 21 and 28, and Debtor's Answer Brief, ECF No. 27.  For the reasons set forth below, this Court **AFFIRMS** the Bankruptcy Court's Order Confirming the Amended Plan of Reorganization of Seaside Engineering & Surveying, Inc, as Modified by the Technical Amendment to the Amended Plan ("Plan").[3]  ECF No. 15, Docket 451.

### Summary of the Facts

Debtor is a closely held engineering and surveying company that is engaged in the unique business of hydrographic surveying and navigational mapping.  Its principal shareholders – John Gustin, James Mainor, Ross Binkley, James Barton, and Timothy Spears – are also officers and directors.   Prior to Debtor's filing for

---

Court.  ECF No. 17 contains various Bankruptcy Docket numbers of transcripts of hearings held before the Bankruptcy Court.

For purposes of citing to the record, this Court will refer to the ECF number, the Docket number, and then the page number of that document.

Multiple documents appear to have been corrupted in the process of filing the electronic record with this Court's ECF System, for example, the Amended Plan of Reorganization, found at ECF No. 14, Docket 339.   The original version of the document as viewed from the Bankruptcy Court filing system does not have the corrupted characters.  Apparently, when that document was loaded into this Court's ECF, some of the headings within the document contained non-character symbols.  The parties supplied the correct copy of the Amended Plan of Reorganization, Docket number 339, from the Bankruptcy Court Docket in hardcopy and Debtor filed an electronic copy.  *See* ECF No. 43-14.  The Amended Plan of Reorganization is the only document this Court references that was affected during the uploading process.

[2]      ECF No. 15, Docket 380.

[3]      The parties also refer to the Plan as the Second Amended Plan.

Chapter 11 bankruptcy, its principal shareholders engaged in real estate ventures and guaranteed the indebtedness.  The ventures were financed by Vision.  The real estate ventures defaulted and the principal shareholders were obligated to Vision for over 4.5 million dollars jointly and severally.  Mr. Gustin, Mr. Mainor, and Mr. Binkley filed Chapter 7 bankruptcies.  Vision is not a creditor of Debtor, rather, Vision has an equity interest in Debtor that it acquired by purchasing Mr. Gustin's stock from the Chapter 7 Trustee.

Vision raises three primary issues on appeal.  First, Vision argues that the Bankruptcy Court erred in determining that the value of the equity interests of Debtor is $200,000.00.  Second, Vision argues that the Bankruptcy Court erred in overruling Vision's motion to strike Debtor's expert testimony based on the expert's use of an improper valuation method.  Third, Vision argues that the Bankruptcy Court erred as a matter of law in confirming the Plan irrespective of its value decision.  This Court concludes that the Bankruptcy Court did not err, and this Court affirms the Bankruptcy Court's Order confirming the Plan.

This Court will address each of the arguments raised by Vision in turn.

## I.   Whether the Bankruptcy Court Erred in Determining that the Value of the Equity Interests of Debtor is $200,000.00?

With respect to the valuation issue, Vision advances four subissues.  First, Vision argues that the Bankruptcy Court failed to value the Plan proposed by Debtor.  Second, Vision argues that the Bankruptcy Court erred by converting the

going concern standard to a forced sale analysis.   Third, Vision argues that the Bankruptcy Court erred by impermissibly rejecting the only competent evidence of Debtor's going concern value.   Fourth, Vision argues that the Bankruptcy Court failed to consider all of Debtor's assets.   This Court will address each subissue in turn.

*Standard of review*

The parties agree on the standard of review for the valuation issue.   "The valuation of stock . . . involves a mixed question of law and fact[;] . . . the bankruptcy court's selection and application of valuation methodology is primarily a legal matter, whereas the findings made under the selected valuation standard are factual."   *Gilliam v. Southern Co-op Dev. Fund Inv. Cooperation*, No. 94-2108-M1/A, 1994 WL 682659, at *3 (W.D. Tenn. Nov. 15, 1994.   The Bankruptcy Court's factual findings are reviewed for clear error.   *See In re Tanner*, 217 F.3d 1357, 1358 (11th Cir. 2000); *In re Dean*, 537 F.3d 1315, 1318 (11th Cir. 2008).   "The bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, [the reviewing court is] left with the definite and firm conviction that a mistake has been made."   *In re Int'l Pharmacy & Disc. II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005); *accord In re International Administrative Services, Inc.*, 408 F.3d 689, 698 (11th Cir. 2005).   This Court "is not authorized

to make independent factual findings." *In re Lett*, 632 F.3d 1216, 1225 (11th Cir. 2011).

 (a) *Whether the Bankruptcy Court failed to value the Plan proposed by Seaside?*

Vision argues that the Bankruptcy Court valued something other than the Plan proposed by Debtor by placing significant weight on the risk of losing certain "key personnel" when the Plan contemplated retention of these employees.[4] In response, Debtor argues that it was proper for the Bankruptcy Court to consider the inherent risk of having the company's future viability tied to certain key personnel whose replacement, if such became necessary, would be difficult if not impossible. This Court concludes that the Bankruptcy Court valued the proposed Plan even though it referenced the replacement of "key personnel." This Court concludes that no error exists as to this subissue.

This Court takes no issue with the argument that a bankruptcy judge must value the Plan as proposed. However, the Bankruptcy Court did not run afoul of that requirement. The Bankruptcy Court valued the entity that was proposed by the Plan. In so doing, the Bankruptcy Court simply noted an inherent risk in

---

[4] To the extent that Vision broadens its argument in its Reply Brief to include the Bankruptcy Court's consideration of "normalizing adjustments' with respect to salaries, this Court notes that such argument was not raised in the Initial Brief, and thus is waived. *See Jones v. Secretary, Dep't of Corr.*, 607 F.3d 1346, 1353-54 (11th Cir. 2010) ("We have repeatedly required litigants to identify errors and provide arguments about their entitlement to relief. This rule means that a litigant who fails in his initial brief even to allege an error waives the right to relief based upon that allegation.").

having at least ninety percent of the company's revenues coming from a single Government client based upon relationships built by a few key[5] employees over a long period of time and those few key employees' special expertise in the unique business of hydrographic surveying. ECF No. 17, Docket 478, pp. 33-34. These unique facts have a bearing on the discount rate, future income, *etc.*, and the Bankruptcy Court's consideration of such facts is not error. The cases cited by Vision do not alter this conclusion. *In re Equity Funding Corp. of Am.*, 391 F.Supp. 768, 771 (C.D. Cal. 1975) recognizes that "[t]he extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case." (quoting *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 527 (1941)). Further, the Bankruptcy Court did not compare the plan to a hypothetical plan, *In re Mirant Corp.*, 334 B.R. 800, 823 (Bankr. N.D. Tex. 2005), nor did it make confusing references to the exact entity being valued. *Gilliam v. Southern Coop. Dev. Fund. Inv. Cooperation*, No. 94-2108-M1/A, 1994 WL 682659, at *4 (W.D. Tenn. Nov. 15, 1994).

---

[5]    The Bankruptcy Court noted that it had reviewed the contracts at issue and did not find the terminology "key personnel." ECF No. 17, Docket 477, pp. 52-53; *accord* ECF No. 17, Docket 477, pp. 95-96; ECF No. 17, Docket 477, p. 140. Debtor's counsel stipulated to such. ECF No. 17, Docket 447, p. 141. However, the Bankruptcy Court distinguished this from whether the Army Corps of Engineers would continue to utilize Debtor if Mr. Gustin left with his 30 years of experience in dealing with the Army Corps of Engineers. ECF 17, Docket 477, p. 95. The Bankruptcy Court noted that there was reference to the resumes of the four managers being submitted at the time of the application. ECF No. 17, Docket 477, p. 95. Thus, while the contracts might not have used the terminology "key personnel," it is clear that Debtor had certain personnel that were integral to its current and future business dealings with the Army Corps of Engineers.

Here, the record makes plain that the value of this company lies in the human capital of a small number of employees with a unique skill set and a relationship with the U.S. Army Corps of Engineers, Mr. Gustin in particular. *See, e.g.*, ECF No. 17, Docket 477, p. 108 (noting that 90% of revenues are tied to Army Corps of Engineers contracts); ECF No. 17, Docket 477, p. 51 (discussing the uniqueness of Mr. Gustin's talents with respect to obtaining Army Corps of Engineers contracts); ECF No. 17 Docket 477, p. 46 (discussing Mr. Gusitn's experience with the Army Corps of Engineers).  Mr. Gustin testified regarding the systems he has developed and their importance to the Army Corp of Engineers, including being "essential," ECF No. 17, Docket 477, p. 46, the "most accurate system" used, ECF No. 17, Docket 477, p. 51, and a "very economical and a very accurate means of mapping."  ECF No. 17, Docket 477, p. 55.  This experience and skill set is important because the Army Corps of Engineers' contracts are qualification contracts, ECF No. 15 Docket 413, pp. 37-38, where the Government seeks specific qualifications for the work, not merely the lowest bid. ECF No. 17, Docket 477, p. 59.

Thus the record bears out that this is not a company whose value can be found in its tangible assets.  As noted by the Bankruptcy Court, "if you don't have the employees and you don't have the contracts, what have you got left?"  ECF No. 15 Docket 369, p. 15.  Debtor has the vast majority of its revenue-generating

abilities tied up in a very few key personnel.  Any one of Debtor's key individuals could leave Debtor tomorrow, for any reason whatsoever,[6] and that individual's knowledge and relationship with the client would also be lost.  There is nothing improper about the Bankruptcy Court's acknowledgment that the impact of one or more of the key personnel leaving Debtor would be substantial and should be considered when valuing Debtor, and such a consideration does not mean that the Bankruptcy Court valued something other than the Plan proposed.

   *(b) Whether the Bankruptcy Court erred by converting the going concern standard to a forced-sale analysis?*

   Vision argues that the Bankruptcy Court erred by not properly applying the going concern standard to the reorganized debtor.  Specifically, Vision asserts that the Bankruptcy Court focused inordinately on the alleged risk factors that would decrease the value of the company from the standpoint of what a "willing buyer" would be willing to pay, which had the effect of valuing the company under the forced sale standard and not based upon the future earning capacities of Debtor.  In response, Debtor argues that the Bankruptcy Court rejected Debtor's suggested valuation standard, liquidation, and utilized Vision's suggested standard, going concern, and for Vision to argue otherwise is simply disingenuous.  This Court concludes that the Bankruptcy Court properly engaged in a going concern analysis

---

[6]     Vision does not contend that Mr. Gustin or any of the key personnel have a required contractual length or a covenant not to compete.

and did not effectively value Debtor under a forced-sale analysis, and this Court concludes that the Bankruptcy Court did not err as to this subissue.

At the outset, the Bankruptcy Court explicitly rejected Debtor's request to engage in a liquidation analysis because it was inappropriate; instead, the Bankruptcy Court agreed with Vision and valued Debtor as a going concern.  ECF No. 17, Docket 478, p. 25.  This Court understands that merely because the Bankruptcy Court stated that it was utilizing the "going concern" standard does not make it so.

As to this point, Vision argues that the Bankruptcy Court focused inordinately on the risks a "willing buyer" would perceive without accounting for what the "willing seller" would bring to the table, thus resulting in a forced sale analysis.  This Court has no quarrel with the proposition that it would be error in this case to place a value on Debtor equal to what a willing buyer would pay for it at a liquidation sale.  Here, however, that did not occur.

Conducting a going concern analysis does not mean that the Bankruptcy Court has to value Debtor as if it has no risk.  Merely because the Bankruptcy Court disagreed with the discount rate, *etc*. advanced by Vision in light of the risk involved does not mean that the Bankruptcy Court valued Debtor under a forced sale analysis.  Instead, the Bankruptcy Court rejected Vision's proposed value, valued Debtor as a going concern and arrived at a lower figure based on a higher

discount rate, *etc.*[7]   Again, as to this subissue, this Court concludes that the Bankruptcy Court did not err.

    *(c) Whether the Bankruptcy Court impermissibly rejected the only competent evidence of the going concern of Debtor?*

    Vision argues that in ruling on the going concern value of Debtor, the Bankruptcy Court failed to articulate what adjustments were made to Vision's expert's, Mr. John Reuben Bice, estimate of $960,000.00 to arrive at the Bankruptcy Court's valuation of $200,000.00,   Additionally, Vision argues that while the Bankruptcy Court was critical of the 18.44% discount rate used by Mr. Bice, the Bankruptcy Court failed to identify what the Court determined to be the proper discount rate.  Further, Vision argues that the Bankruptcy Court erred in considering the fact that Debtor was in bankruptcy as negatively impacting the value of the reorganized debtor.   In response, Debtor asserts that Vision's argument ignores the Bankruptcy Court's twelve-page detailed explanation leading up to the Court's conclusion that Debtor should be valued at $200,000.00.  This Court concludes that the Bankruptcy Court correctly followed the applicable law and that its valuation of Debtor was based upon record evidence and the

---

[7]    If the Bankruptcy Court had engaged in a liquidation analysis then arguably the Bankruptcy Court would have arrived at a negative value.  This is so as evidenced by the fact that Mr. McCullar opined that the liquidation value of Debtor was a negative ($628,000.00). ECF No. 17, Docket 478, p. 11.

Bankruptcy Court did not clearly err in relying upon record evidence to reach a valuation of $200,000.00.

Vision essentially argues that the Bankruptcy Court had to accept its expert's valuation figure because it was the only competent evidence of Debtor's going concern value.  In so arguing, Vision misses the mark.  The Bankruptcy Court was free to accept the testimony of any witness, including an expert witness, in whole or in part.  Here, the Bankruptcy Court rejected the conclusion of Debtor's expert that Debtor should be valued under the liquidation standard and concluded, properly so, that Debtor should be valued under the going concern standard.  However, merely because the Bankruptcy Court agreed with Vision's expert, Mr. Bice, with respect to the valuation method, that does not mean that the Bankruptcy Court had to accept Mr. Bice's valuation number lock, stock, and barrel.  As demonstrated below, the Bankruptcy Court properly relied upon record evidence to discredit Mr. Bice's valuation, specifically the discount rate utilized by Mr. Bice.  Doing so was not error.

In conducting a going concern valuation of Debtor, Mr. Bice utilized the income approach by "look[ing] at the earning capacity of the business and using a discount rate that is reflective of the risk associated with the business [which] determines what the value of a future stream of income would be utilizing such a discount rate."  ECF No. 15, Docket 369, p. 65.  Mr. Bice used a "build-up"

discount rate of 18.44%, allocating only 1.5% for the company-specific risk.  ECF. 15, Docket 369, pp. 85-86.  If one of Debtor's key personnel were to leave, Mr. Bice did not believe that it would be overly difficult to replace the employee and would not result in cancellation of the contracts.  ECF No.15, Docket 369, p. 97; ECF No.  15, Docket 369, p. 107-09.  Based on the above, Mr. Bice valued Debtor at $960,000.00.  ECF No. 15, Docket 369, p. 92.

Mr. Robert McCullar testified in rebuttal and provided a critique of Mr. Bice's analysis; he explained that the discount rate is critical and probably the most subjective factor.  ECF No. 14, Docket 300, p. 44.  It is critical because "just a few tweaks in the discount rate that is used can make a huge difference in the valuation that you end up with."  ECF No. 14, Docket 300, p. 44.   To illustrate the importance that the discount rate has on valuation, Mr. McCullar testified that by increasing the discount rate from the 18.44% utilized by Mr. Bice to 25.94%, the increase would reduce the value of the company as found by Mr. Bice from $960,000.00 to $575,460.00.  ECF No. 14, Docket 300, pp. 46-47.

Mr. McCullar took issue with Mr. Bice's recommendation to utilize an 18.44% discount rate, specifically the 1.5% company's specific risk.  ECF No. 14, Docket 300, p. 44.  Mr. McCullar testified that the 18.44% discount rate Mr. Bice utilized is "way understated," and that the company specific risk would be "major."  ECF No. 14, Docket 300, p. 44.   Mr. McCullar testified that Mr. Bice

12

"failed to separate the value of the business itself from the value of the professional owners of the business."  ECF No. 14, Docket 300, p. 17.

Mr. Gustin testified that as a result of a Department of Labor audit, Debtor now has an $80,000.00 liability for back wages and taxes to its employees.  ECF No. 17, Docket 477, p. 78-79.  Mr. Gustin said that Mr. Bice did not consider this liability.  ECF No. 14, Docket 300, pp. 39-42.  Mr. McCullar testified that the company was actually looking at a loss of approximately a quarter of a million dollars for 2011.  ECF No. 14, Docket 300, p. 42.  Mr. Bice utilized a figure for that period representing a loss of roughly $57,000.00.   ECF No. 14, Docket 300, pp. 39-40.  Mr. McCullar explained that a loss in the most recent year is a relevant factor when a company that has had a history of operating profits suddenly finds itself facing a loss of close to a quarter million dollars.  ECF No. 14, Docket 300, p. 42.

Mr. McCullar further criticized Mr. Bice's conclusion because it failed to adequately consider the difficulty of replacing key personnel.  ECF No. 14, Docket 300, pp. 20-22.   Specifically, Mr. McCullar noted that "[d]ue to the special technical skills that these key [individuals] . . . possess . . . it would be difficult if not impossible to replace them."  ECF No. 14, Docket 300, p. 21.  Further, Mr. McCullar testified that Debtor's "current liabilities . . . are approximately three times its cash."  ECF No. 14, Docket 300, p. 30.  Thus, based upon his analysis of

Debtor's financial statements, Mr. McCullar was of the opinion that Debtor did "not have the resources to withstand any sort of interruption of its services and to go through the process of finding key personnel." ECF No. 14, Docket. 300, p. 30.

Mr. McCullar testified that the author of one of the treatises relied upon by Mr. Bice used an example of a company in financial difficulty and chose an 80% discount rate, noting that "if venture capital rates are on the ceiling, this company's rates are on the roof." ECF No. 14, Docket 300, p. 45. With respect to Debtor, Mr. McCullar testified that Debtor's rates should "either be on the ceiling or somewhere in the attic." ECF No. 14, Docket 300, p.45. Mr. McCullar stated that if he were to give an opinion on what the applicable discount rate for Debtor should be, he would estimate it to be in the range of 40% to 75%. ECF No. 14, Docket 300, p. 47.

It was not lost on the Bankruptcy Court that Mr. Bice valued Debtor at roughly the same value that its principals did several years earlier: "it seems extraordinary to the Court that the value of the company found by Mr. Bice to be $960,000 is only $40,000 less than what the principals had placed on the value in 2008 and 2009 . . . and . . . even in 2010." ECF No. 17, Docket 478, p. 30.

The above testimony was properly before the Bankruptcy Court to consider. Thus, this Court concludes that by not wholeheartedly adopting Mr. Bice's

valuation figure, the Bankruptcy Court did not impermissibly reject the only competent evidence of Debtor's value.

Vision's argument that the Bankruptcy Court effectively pulled a number out of thin air or merely split the difference between the two experts' valuations figures is likewise misplaced. While the Bankruptcy Court did not precisely articulate from a mathematical perspective how it arrived at the $200,000.00 valuation figure, the law does not require a bankruptcy judge to reduce its analysis to a mathematical formula. Instead, a bankruptcy judge's findings must be supported by the record. Here, the Bankruptcy Court's findings were supported by the record.

It is well settled that a court assigning a value to a company is afforded wide discretion and that the court "may be selective in determining what portions of each expert's opinion, if any, to accept." *In re Webb Mtn, LLC.*, 420 B.R. 418, 435 (E.D. Tenn. 2009) (quoting *Whitehouse Hotel L.P. v. Comm'r*, No. 12104-03, 131 T.C. 112, 2008 WL 4757336, at *21 (U.S. Tax Ct. Oct. 30, 2008) *vacated and remanded on other grounds*, 615 F.3d 321 (5th Cir. 2010)); *accord In re River Valley Fitness One Ltd.'s P'ship*, Bankruptcy No. 01-12829-JMD, 2006 WL 618442, at *8 (Bankr. D.N.H. Mar. 7, 2006). The notion that the court is not tied to an expert's valuation is also seen in the proper application of the willing buyer/willing seller approach:

As one federal court has explained in discussing the willing buyer-willing seller standard, the "'willing buyer' and 'willing seller' whose judgment the court is charged to simulate are hypothetical persons-constructs of the law." *Wallace v. United States,* 566 F.Supp. 904, 910 (D. Mass. 1981). Such hypothetical characters "are attentive to expert advice, but they know that experts often differ." *Id.* "In the end, they test the experts' advice, and formulas ... to bolster their advice, against common sense." *Id.* at 910-11.

*National Rural Utilities Co-op. Finance Corp. v. Wabash Valley Power Ass'n.*, 111

B.R. 752, 769 (S.D. Ind. 1990). This is especially true when valuing a stock:

The final figure on which the hypothetical willing buyer and willing seller would agree is likely to be one within a range the formulas help to define but may be different from the figure produced by any of the formulas advanced by expert witnesses. This is inherently the nature of a legal "standard" for valuing stock by the "willing-buyer-willing-seller" criterion. It calls for an evaluative determination by the factfinder, not a precise calculus from authoritative premises and ascertained facts.
....
The final determination of value under the willing-buyer-willing-seller standard may be, and usually is, not a calculation by formula but a judgmental choice about the relative weight to be given to factors reflected in different sets of proposed assumptions inherent in different formulas advanced by expert witnesses and counsel.

*Wallace v. U.S.*, 566 F.Supp. 904, 911 (D.C. Mass. 1981) (citations omitted); *cf.*

*Consolidated Rock Products Co. v. Bagley*, 312 U.S. 510, 526 (1941) (observing

that the determination of earning capacity for the purpose of valuation requires

prediction based upon informed judgment of all relevant facts, "which must be

distinguished from mathematical certitude" ). The above statements are amplified

when valuing an equity interest of a closely held corporation that is not publicly

traded due to the difficulty of the task.  *Cf. Olsen v. Floit*, 219 F.3d 655, 658 (7th Cir. 2000) (observing the valuation of private companies is "almost impossible"); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 363-64 (3rd Cir. 2002) (observing the "difficult task of valuing the stock of a company which is privately owned and not traded on a public exchange").  These same principals of discretion are implicated in determining the appropriate discount rate.

The Bankruptcy Court acknowledged that there were "two different experts talking about what each of them viewed as a discount rate," and that the valuation number would change drastically depending on the discount rate used.  ECF No. 17, Docket 477, p. 298; *accord* ECF No. 17, Docket 477, p. 303.  Case law recognizes that the discount rate has a "powerful effect" on the value.  *Cf. United Air Lines, Inc. v. Regional Airports Imp. Corp.*, 564 F.3d  873, 879 (7th Cir. 2009).

This Court concludes that the Bankruptcy Court's determination of valuation is within the relevant range of values that can be appropriately determined from the evidence, especially in light of Mr. McCullar's testimony that changing the discount rate by 7 points, from 18% to 25% would result in a decrease in valuation from $960,000.00 to $575,000.00.   Therefore any discount rate within the range suggested by Mr. McCullar, 40%-75%, would produce results as reached by the Bankruptcy Court or a lesser value.

As demonstrated above, for the reasons thoroughly set forth on the record and in the oral ruling, the Bankruptcy Court disagreed[8] with several aspects of Mr. Bice's analysis based upon testimony properly before the Bankruptcy Court. ECF No. 17, Docket 478, pp. 26-35. Thus, contrary to Vision's assertions, the Bankruptcy Court did not merely split the difference between the estimates of the two experts. Having reviewed the findings of the Bankruptcy Court and the valuation set forth by Mr. Bice and Mr. McCuller's critiques of Mr. Bice's approach, this Court concludes that the Bankruptcy Court's valuation of Debtor was not clearly erroneous.

Finally, this Court agrees that a market value approach that focuses inordinately on a perspective buyer's concern over the alleged risks presented by a company coming out of bankruptcy will reflect the fact that markets undervalue such entities due to the "taint" of the proceedings. However, that did not occur here. The contested language Vision references grew out of the Bankruptcy Court's recognition that despite the loss of almost $240,000.00 in 2011, Mr. Bice valued Debtor at roughly the same figure as Debtor's principals valued it during 2008, 2009, and 2010; the Bankruptcy Court commented that by Mr. Bice doing so, it "underscores the point that Mr. Bice did not seem to give much weigh[t] to

---

[8]     The Bankruptcy Court made comments indicating that the 18.44% was low considering the circumstances: "I don't agree with your assessment or your witness's assessment, particularly with the discount rate. I think it's . . . I don't know how he could have arrived at such a discount rate . . . ." ECF No. 17, Docket 477, p. 307.

the fact that the company was in bankruptcy and that as such it not only affected their value, it affected their credit rating, borrowing power and potential for obtaining new business."  ECF No. 17, Docket 478, p. 30.  The Bankruptcy Court, did not value the company strictly on a market analysis from the viewpoint that a prospective purchaser would view Debtor, thus Vision's reliance on *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003) is misplaced.   Rather, the Bankruptcy Court's observation was more analogous to an emergence premium as seen in *In re Nellson Nutraceutical, Inc.*, 2007 WL 201134 (Bankr. D. Del. 2007): applying a premium in determining the discount rate "to account for the increased risks to earning capacity that the Debtors face as a result of being in bankruptcy and emerging from bankruptcy."  *Id*. at *27, 34.   When viewed in context, this is exactly what the Bankruptcy Court did.  This Court concludes that the Bankruptcy Court did not err.

### (d)Whether the Bankruptcy Court failed to consider all of Debtor's assets?

Vision argues that the Bankruptcy Court ignored certain assets of Debtor.  Specifically, Vision asserts that the Bankruptcy Court failed to properly value Debtor's existing contracts and relationships with the Army Corps of Engineers, the specialized equipment, and an assembled workforce.  Further, Vision asserts that the Bankruptcy Court failed to assign value to the preservation of defenses and rights of actions retained by Debtor in Article IX, Section F of the Amended Plan.

In response, Debtor argues that the value of "assets" per se is not utilized in the going concern approach, as utilized by both Mr. Bice and the Bankruptcy Court, because they are already taken into account.  With respect to Article IX, Section F, Debtor argues that the record is clear that it merely reserved those rights for purely defensive reasons in order to avoid waiving them if faced with litigation.

This Court concludes that Vision has not shown reversible error in the Bankruptcy Court's failure to specifically itemize the value of certain contracts, equipment, *etc*. in light of the fact that the Bankruptcy Court utilized the going concern income approach, as did Vision's expert.  As explained by Mr. Bice, the income approach to valuation looks at the earning capacity of the business; in contrast, the asset approach to valuation ascribes a value to the assets and the liability of the business.  ECF No. 15, Docket 369, pp. 64-65.   This distinction is also recognized in case law.  *See, e.g., Horn v. McQueen*, 353 F. Supp. 2d. 785, 791-92 (W.D. Ky. 2004); *cf. Dawkins v. Hickman Family Corp.*, No. 1:09-CV-164, 2011 WL 2436537, at *5 (N.D. Miss. June 13, 2011) (noting that the income approach is not the most relevant valuation methodology to value an asset holding company whose real value lies in the value of the its assets as opposed to its income generating abilities).

Vision's argument that the Bankruptcy Court failed to assign value to pre-petition and post-petition claims retained by Debtor in Article IX, Section F of the

Amended Plan is equally unavailing for several reasons.   First, it is unclear whether the Bankruptcy Court was ever afforded an opportunity to rule on this specific objection.   In the Amended Plan, Debtor preserved certain defenses and rights of action against certain entities.[9]   *See* ECF No. 14, Docket 339, p. 39.   In its Objection to Confirmation of Debtor's Amended Plan, Vision urged that the $200,000.00 valuation understates the value of Debtor because, in part, it did not assign any value to the pre and post-petition claims contained in Article IX, Section F, of the Amended Plan.   ECF No. 15, Docket 376, p. 21, ECF No. 15 electronic page number 364 of 1219.[10]   The Technical Amendment to the Amended Plan clarified that the value of these reservations were speculative at present and could only be realized through protracted litigation and that Debtor had no plans to pursue the reserved claims.   ECF No. 15, Docket 380, p. 7.   The Technical Amendment noted that the reservation was set forth merely to avoid waiving such claims should Debtor or the Reorganized Debtor find itself faced with litigation brought against it outside the narrow scope of the Exculpation Clause.   In its Objection to the Confirmation of Debtor's Amended Plan as

---

[9]      Vision Bank, Vision Park Properties, Park National Bank, Park National Corporation, Centennial Bank, SE Property Holdings, LLC, Southeast Property Solutions, LLC, the Chapter 7 Trustee, and various attorneys that have represented Vision in these proceedings.

[10]      The copy of the objection loaded into ECF does not have the Bankruptcy Docket information as a header, thus a parallel cite to the relevant, electronic page number of the entire ECF No. 15 document is provided as well.

Modified by the Technical Amendments, Vision did not object on the grounds that the Bankruptcy Court erred in not assigning a value to the reservation of rights.[11] *See* ECF No. 15, Docket 415, ECF No. 15 electronic page number 997 of 1219.

Second, not assigning value to the reservation of rights was not error based upon the facts of this case.  While it is unclear whether the Bankruptcy Court was afforded an opportunity to address this specific issue, the Bankruptcy Court did address whether the "non-favored insiders" were unfairly discriminated against by Debtor's preservation of defenses and rights of action.  In so doing, the Bankruptcy Court found that "the reserve claims set forth therein will not be pursued ostensibly and that they will only be used in the event of being faced with litigation brought against the debtor or the reorganized debtor."  ECF No. 17, Docket 474, p. 49.  The Bankruptcy Court noted that this was "set forth clearly in the [Plan]" and "was reiterated in the brief of the debtor as well as clearly represented in open court by debtor's counsel."  ECF No. 17, Docket 474, pp. 49-50.[12]   Thus, Debtor is bound

---

[11]     In the Objection, Vision references an earlier argument from Document 376 and incorporates it by reference; however, that argument dealt with the Bankruptcy Court's application of several factors utilized in discounting Mr. Bice's valuation, not that the Bankruptcy Court should have valued Debtor's reservation of rights.  ECF No. *See* ECF No. 15, Docket 415, ECF No. 15 electronic page number 997 of 1219.

[12]     Mr. Gustin testified to this as well: Q: "Your testimony is . . . that you're not seeking to use it to sue anyone, but you don't want to waive those rights is . . . your understanding of what your lawyer told you the law was?"  A:  "That's exactly . . . right, yes, sir."  (ECF No.15, Docket 413, pp. 53-54.)  Q: "In case you all are sued you want to be able to have those defenses or use those only in that instance?"  A: "yes, sir, that is entirely our purpose.  . . . I'm stating that on the record and going forward, that is entirely our purpose for having that in there. . . . [I]t is a defense, not an offense."  ECF No. 15, Docket 413, p. 54.

by representations made by counsel as noted by the Bankruptcy Court in its order. Accordingly, this Court concludes that the Bankruptcy Court did not err as to this subissue.

## II.   Whether the Bankruptcy Court Erred in Overruling Vision's Motion to Strike Debtor's Expert Testimony Based on his Use of an Improper Valuation Method?

Vision argues that the Bankruptcy Court erred in denying Vision's motion to strike Debtor's expert, Mr. McCullar's, testimony because he was retained by Debtor to perform a liquidation valuation that was not relevant to these proceedings.  Such error was not harmless, Vision reasons, because the Bankruptcy Court was impermissibly influenced by McCullar's liquidation analysis.   In response, Debtor argues that this issue was not timely raised, that Vision only moved to Strike McCullar's direct testimony, not his rebuttal testimony given two days later, and that the testimony was relevant.

Vision agrees that a reviewing court applies "an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).  This Court concludes that the Bankruptcy Court did not abuse its discretion for several reasons.  First, while Vision objected to Mr. McCullar's testimony on direct examination on the grounds

of relevance because he used the liquidation approach,[13] Mr. McCullar testified as a rebuttal witness to critique Mr. Bice's valuation without objection. ECF No.14, Docket 300, p.13.

Second, Mr. McCullar's testimony, at the very least on rebuttal, was relevant. Mr. McCullar was clear that he did not do a going concern valuation in this case, ECF No. 14, Docket 300, p. 48; however, he testified that his critique of Mr. Bice's selected discount rate was a new analysis that he performed after he received Mr. Bice's opinion. ECF No. 14, Docket 300, p. 53.[14] An expert's opinion is not inviolable. While an expert opinion "may not be arbitrarily ignored," *see Perez v. Cain*, Civil Action No. 04-1905, 2008 WL 108661, *8 (E.D. La. Jan. 8, 2008) (quoting *Brock v. United States*, 387 F.2d 254, 257 (5th Cir. 1967)), one way to discredit the testimony of an expert witness is through another expert. "[I]t is standard for an expert witness to point out methodological flaws in

---

[13]     Vision objected to Mr. McCullar and moved to strike his testimony at the close of his testimony valuating Debtor using a liquidation valuation approach on February 15, 2012, citing reasons articulated at the beginning of the hearing, namely it disagreed with the methodology used by Mr. McCullar. ECF No. 15, Docket 369, pp. 13-14; 19; 55-56. The Court overruled the objection and denied the motion to strike: "It may go as to what weight I give to it after I've had the opportunity to read your brief and review the law, and then I'll assign what weight I think it's due to be given and go from there." ECF No. 15, Docket 369, p. 56.

[14]     In response to Vision's argument that Mr. McCullar only provided testimony with respect to liquidation value, the Bankruptcy Court was quick to note that Mr. McCullar also discussed the discount rate: "No, he was not. He was answering questions . . . given the circumstances of the situation, of the concern as it is, and what the plan was going to be, that was his opinion of the discount rate. He thought your client was extraordinarily low." ECF No. 17, Docket 477, pp. 303-04.

24

an opposing expert's analysis." *Smith v. Pfizer Inc.*, No. 3:05-0444, 2010 WL 1963379, *4 (M.D. Tenn. May 14, 2010).  Such is the case here.

During rebuttal Mr. McCullar testified that he had reviewed Mr. Bice's valuation report and he disagreed with Mr. Bice's conclusion of the $960,000.00 value.  ECF No. 14, Docket 300, p. 14.   Specifically, Mr. McCullar testified that the discount rate used by Mr. Bice was "unusually low under the circumstances" for the reasons articulated in the preceding subissue.  ECF No. 14, Docket 300, p. 17.   Mr. McCullar's direct testimony regarding his report using liquidation valuation during the February 15 hearing does not render his rebuttal critique of Mr. Bice's report inadmissible.   Thus, this Court concludes that the Bankruptcy Court did not abuse its discretion in overruling Vision's motion to strike and, in any event, the motion to strike was not directed at the rebuttal evidence which is the testimony upon which the Bankruptcy Court relied on in rejecting the value proposed by Mr. Bice.

### III.    Whether the Bankruptcy Court Erred as a Matter of Law in Confirming the Plan Irrespective of Its Value Decision?

#### (a) Whether the Bankruptcy Court improperly approved non-Debtor releases in Debtor's Plan?

Vision argues that the plan includes a complete release of and exculpation from all existing and potential claims against non-debtor parties and that such a broad release and exculpation without establishing any basis or extraordinary need

25

is not permitted under § 524(e) of the Code.  In response, Debtor argues that the scope of the release is narrow, excluding any release from fraud, gross negligence or willful misconduct, and only encompasses acts in the course of the bankruptcy itself.

Both parties agree that the Eleventh Circuit has not ruled on the issue and that the majority approach allows for non-debtor releases in "certain factual circumstances if such releases are necessary and fair."  *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879 (Bankr. S.D. Fla. 2009).  "Routine inclusion of non-debtor releases is not appropriate." *Id.* (quoting *In re Transit Group, Inc.*, 286 B.R. 811, 817 (Bankr. M.D. Fla. 2002)).  Vision agrees that this Court reviews the Bankruptcy Court's determination of factual findings such as those to support non-debtor releases under the clearly erroneous standard; however it urges that the standard is slightly heightened for non-debtor release cases.  This Court concludes that even under a heightened standard of review the Bankruptcy Court did not err.

The Bankruptcy Court set forth ample factual findings to justify its finding that the non-debtor releases were necessary and fair in carrying out the purposes of the Plan.  In the August 20, 2012, oral opinion confirming the Plan, the Bankruptcy Court found that

> [t]o say that this case has been highly litigious would be an understatement. The preconfirmation discovery seemed to go on forever, all the way up to the point of the confirmation hearing.  When the Court sent the case to mediation, Vision served two principals of

26

the debtor on their exit from the mediation with a subpoena.  It served a subpoena on debtor's new employee on its first day of work and never called him as a witness.  The number of pleadings and flow of paper in this case has been voluminous.  The debtor has, prior to filing its bankruptcy, filed an action in state court as well as an appeal of Judge Killian's order authorizing the sell [sic] of Dr. Gustin's stock to Vision.

This Court has no reason to believe that in the event of a confirmation that any of the litigation would cease, slow down or become any less volatile.

Vision has shown its desire to continue with litigation.  The Court, because of the unusual nature and posture of the litigation already existing in this case, finds that an exculpation clause is reasonable, fair and necessary.  Without it, it would be doubtful that the engineers and surveyors would ever be able to perform their professional work, complete contracts and create receivables necessary for the life blood of the reorganized debtor.

It is obvious to the Court that this case is a death struggle for the control of the debtor and the reorganized debtor.  Although Vision has pointed to the amount of attorney's fees expended on the debtor's behalf, the Court is cognizant that the attorneys for Vision have expended a great deal of time and effort which would appear disproportionate to the value of Vision's equity interest even if the value of the debtor was in the amount of Vision's claims of $960,000.

ECF No. 17, Docket 474, pp. 46-48.

The Bankruptcy Court's findings are supported by the record, including Mr. Gustin's description as to the effect the litigation with Vision has had on the company, essentially demanding significant time and energy from their professionals at the expense of using those resources to advance the business purpose of Debtor.   ECF No. 15, Docket 413, pp. 58-59.  Mr. Gustin further

explained that effect is compounded by the fact that the critical nature of the work Debtor performs impacts public safety and requires compliance with stringent deadlines and certain data that can only be obtained during certain times of year. ECF No. 15, Docket 413, pp. 61-62.  Additionally, Mr. Gustin testified that not only has his experience with Vision lead him to the conclusion that Vision is litigious, but that he "believe[s] they've verbalized it to [Debtor]."  ECF No. 15, Docket 413, p. 64.

This Court concludes that the Bankruptcy Court did not err in finding the non-debtor releases were necessary and that this case presents one of the unusual circumstances justifying the use of non-debtor releases.

*(b)  Whether the Bankruptcy Court erroneously found that Debtor proposed the Plan in good faith?*

Vision argues that Debtor's Plan[15] was proposed in bad faith and in violation of § 1129(a)(3) of the Code.  Further, Vision asserts that the Bankruptcy Court dismissed this argument out of hand and refused to even hear evidence.  Debtor responds by arguing that not only did the Bankruptcy Court allow Vision to argue its point, but it issued ample findings of fact to support its holding that Debtor proposed the Second Amended Plan in good faith.

---

[15]     Vision limited its argument to the Plan, as opposed to the petition, before the Bankruptcy Court, ECF No. 17, Docket 477, pp. 308-09, and it does so in its brief on appeal as well.

As to this issue, "the standard of review is well settled: a court's finding with respect to the good faith requirement imposed under 11 U.S.C. § 1129(a)(3) is reviewed for clear error." *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 709 (4th Cir. 2011). For the reasons set forth below, this Court concludes that the Bankruptcy Court's finding of good faith was not clear error.

Initially this Court finds Vision's argument that the Bankruptcy Court "capriciously dismissed" the good faith argument without even hearing evidence to be unpersuasive. Merely because the Bankruptcy Court found that the Plan was proposed in good faith does not mean that it did not make an informed decision.

As to the merits, in *In re McCormick*, the Eleventh Circuit explained the "good faith" requirement as follows:

> In order to be confirmed, a Chapter 11 reorganization plan must be submitted in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). While the Bankruptcy Code does not define the term, courts have interpreted "good faith" as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code. *In re Block Shim Development Company-Irving,* 939 F.2d 289, 292 (5th Cir.1991); *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984); *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764-65 (1st Cir.1983) (in corporate reorganization, plan must bear some relation to statutory objective of resuscitating a financially troubled company).

> Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied. *Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2nd Cir. 1988); *In re Sun Country Development, Inc.,* 764 F.2d 406, 408 (5th Cir. 1985); *In re Mulberry Phosphates, Inc.,* 149 B.R. 702, 707 (Bankr. M.D. Fla. 1993).

> The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan, *Block Shim,* 939 F.2d at 292; *Madison Hotel,* 749 F.2d at 425, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. *Sun Country,* 764 F.2d at 408.

*In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995).

Here, the Bankruptcy Court made factual findings supporting its finding that

the Plan was filed in good faith.  The Bankruptcy Court found that the

> evidence shows that the debtor's line of credit was cut off, that there appear[ed] to be a very real possibility that Vision could acquire and had the ability to acquire the shares of Mainor and Binkley from the Chapter 7 trustees, which would be detrimental to the debtor with respect to its government contracts with the Corps of Engineers and its status as a small business.

> This risk would seem to be a valid reason for attempting to carefully plan possible solutions which would include a Chapter 11 plan of reorganization, which would ultimately pay not only the creditors but the interest holders the proportionate value of their interest the debtor has set forth in their second amended version of the plan.

> If successful, the plan would preserve the jobs, maintain the debtor as a going concern, pay the creditors and also pay the interest holders the value of their interest over time.

ECF No. 17, Docket 474, pp. 24-25.  The Bankruptcy Court also noted that the

"plan has been accepted by all the debtor's creditors.  This includes creditors who

are impaired as required by the code."  ECF No. 17, Docket 474, p. 21.

The Bankruptcy Court's findings are supported by the record.  It is clear that debtor was experiencing financial difficulties; Mr. Gustin testified to such.  ECF No. 17, Docket 477, p. 107.  Specifically, Mr. Gustin testified that Debtor historically maintained three-month's worth of operating capital on hand.  ECF No. 17, Docket 477, p. 107.  However, during the economic downturn, the operating capital was exhausted.  ECF No. 17, Docket 477, p. 107.  When the economy changed drastically, Debtor shifted its emphasis from the local survey engineering work to engineering work for the Army Corps of Engineers. ECF No. 17, Docket 477, pp. 106-07.  This resulted in a financial strain on Debtor because more travel and equipment were required, ECF No. 17, Docket 477, p. 107, and multiple crews had to be sent out of town.  ECF No. 17, Docket 477, pp. 107-08.  The nature of the projects required capital outlay in advance of payment, thus, Debtor had to obtain a line of credit after the three-month capital reserve was exhausted.  ECF No. 17, Docket 477, p. 108.  Debtor obtained a $150,000.00 line of credit with Premier Community Bank.  ECF No. 17, Docket 477, pp. 108-09.

By the end of 2010, the line of credit was "maxed out."  ECF No. 17, Docket 477, p. 109.  At the time Debtor's line of credit was up for renewal, Premier Bank did not renew.  ECF No. 17, Docket 477, p. 118; *accord* ECF No. 15, Docket 369, p. 114.   In an effort to cut costs, Debtor discontinued any distributions to shareholders in 2011.   ECF No. 17, Docket 477, pp. 109-10.   Debtor also

implemented an across-the-board 10% minimum pay cut in 2009 as a cost-cutting measure.  ECF No. 17, Docket 477, p. 108.  Thus, it is clear that the Bankruptcy Court's finding that Debtor's financial position threatened its status as a viable entity was not clearly erroneous.

The record supports the Bankruptcy Court's finding of good faith in other respects.  The Plan provides for payment in full to all creditors.  In contrast, Mr. Gustin testified that if the case were converted to a Chapter 7 case then the creditors would receive 23 cents on the dollar.  ECF No. 17, Docket 477, p. 65.  All creditors voted in favor of the Plan.  ECF No. 17, Docket 477, p. 36.   Mr. Gustin testified that the reorganized debtor intended on continuing to employ all 23 workers currently with Debtor. ECF No. 17, Docket 477, p. 37. Mr. Gustin testified that Debtor is designated as a small business, and therefore is eligible for contracts that are set aside for only small businesses.  ECF No. 17, Docket 477, p. 102.  Debtor's counsel noted that if Vision acquired a majority interest then it would destroy Debtor's opportunity to compete for the set-aside contracts.  ECF No. 17, Docket 477, p. 134.  For the reasons set forth above, this Court concludes that the Bankruptcy Court's finding of good faith was not clear error.

Further, contrary to Vision's argument, the Plan was not proposed for the sole benefit of the insiders.  This Court understands that when a debtor's proposed Chapter 11 plan is not intended for the benefit of debtor or its creditors, but is

intended for the sole and exclusive benefit of its insiders, then the plan has not been proposed in good faith.  *See In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448 (Bankr. N.D. Fla. 2011).  However, such is not the case here.[16]  This Court agrees with the conclusion of the Bankruptcy Court that the cases cited by Vision are distinguishable from this case because all the creditors and interest holders are being paid in full.  ECF No. 17, Docket 474, pp. 23-24.  The Plan advances the purposes of the Bankruptcy Code in that it salvages a financially distressed company as a going concern, pays the creditors, pays the interest holders the value of their interest over time, and preserves jobs.

   (c)*Whether the Bankruptcy Court erroneously found the Plan did not unfairly discriminate against Vision-Park and was fair and equitable to Vision-Park?*

   Vision argues that Debtor cannot utilize the "cramdown" provision of § 1129(a) because it does not meet the requirements of § 1129(b)(1), namely that the Plan may only be confirmed if it (1) does not discriminate unfairly;  and (2) is fair and equitable to the impaired class of interests that have not accepted the Plan. Debtor responds by arguing that the Plan satisfied the requirements of § 1129(b)

---

[16]    In response to this argument, the Bankruptcy Court commented that the bankruptcy Plan is about more than just Vision's interest, especially in light of all the creditors approving the Plan.  ECF No. 17, Docket 477, pp. 311-12.  In that vein, the Bankruptcy Court questioned how Vision could argue that the Plan was not for anyone's benefit other than the favored interest holders.  ECF No. 17, Docket 447, p. 312.  Ultimately, the Bankruptcy Court held that such an argument "ignores the fact that all of the creditors have accepted the plan. The creditors will be paid pursuant to the plan, and . . . the interest holders will be paid for their proportionate interest in the debtor in full."  ECF No. 17, Docket 474, p. 23.

and that the Bankruptcy Court made sufficient factual findings and correctly applied the law in reaching its conclusion. This Court concludes that the Bankruptcy Court was correct in determining that the Plan did not unfairly discriminate against Vision and was fair and equitable.[17]

1.  Whether the Bankruptcy Court committed reversible error in finding that Debtor proved by a preponderance of the evidence that the Plan did not unfairly discriminate against Vision-Park?

Vision argues that the Plan unfairly discriminates against the disfavored equity holders, including Vision, by leaving them holding the unsecured equity promissory notes for their shares of Debtor while on the other hand Debtor's favored insiders receive the same promissory notes for their share of Debtor but also receive shares in the new company. Debtor responds by arguing that since all equity holders are being equally extinguished and being equally paid 100% of the value of their interests, there simply is no discrimination regarding treatment of equity holders under the Plan, regardless of whether the ownership in the new company were to consist of a subset of old equity – which, incidentally, is not the case here as the "new equity" is held by trusts, the beneficiaries of which are not the original shareholders. This Court concludes that the Plan does not unfairly discriminate.

---

[17]   This Court notes that much as Vision mixed its arguments with respect to these issues before the Bankruptcy Court, *see,* ECF No. 17, Docket 474, pp. 37-38; ECF No. 15, Docket 415, ECF No. 15 electronic page number 982 of 1219, it does so before this Court as well.

Section 1129(b)(1) provides that a plan may be confirmed if it "does not discriminate unfairly . . . with respect to each class of . . . interests that is impaired under, and has not accepted the plan."  "The concept of unfair discrimination is not defined under the Bankruptcy Code."  *In re 710 Long Ridge Road Operating Company, II, LLC*, Case No.: 13-13653, 2014 WL 886433, at *19 (Bankr. D.N.J. Mar. 5, 2014) (slip copy).

The Bankruptcy Court was correct in concluding that the case law relied upon by Vision is inapposite inasmuch as the Plan "in this case has been unanimously accepted by all classes of creditors, unlike [the cases cited by Vision]. Further and importantly, the interest holders in this case under the [Plan] are being paid their pro rata share of their interest as valued by the Court."  ECF No. 17, Docket 474, p. 39.  The two cases cited by Vision as to this subissue on appeal are distinguishable.  The plan at issue in *Courtside Village, LLC,* No. 03-10105, 2003 WL 22764541 (Bankr. N.D. Cal. Oct. 29, 2003) envisioned the "class 3 creditors," really junior equity interest holders, being eliminated but not being paid in full.  In fact the judge estimated that the class 3 creditors would "probably [get] nothing." 2003 WL 22764541, at *1.  In contrast, Vision and all of the equity interest holders were paid in full for their interest in Debtor – which takes into account future profits – and the shares were extinguished.  *In re Shadow Bay Apartments, Ltd.*, 157 B.R. 363 (Bankr. S.D. Ohio 1993) is not informative because the instant case

does not present the scenario of some equity interest holders retaining their shares for free while the other equity holders provide capital to keep their shares.  Instead, here, every equity holder received the full value for their respective shares and the shares were extinguished.

2.  <u>Whether the Bankruptcy Court committed reversible error in finding that Debtor proved by a preponderance of the evidence that the Plan was fair and equitable?</u>

Vision argues that the Bankruptcy Court erred in confirming the Plan because it fails to meet the statutory "fair and equitable" test because it did not satisfy either § 1129(b)(2)(C)(i) or (ii).  Vision agrees that this Court reviews the Bankruptcy Court's determination that the Plan was fair and equitable under the clearly erroneous standard.  *See* ECF No. 21, p. 2.  This Court concludes that the Bankruptcy Court did not clearly err in concluding that the Plan was fair and equitable; this Court would reach the same conclusion under the de novo standard as well.  This Court will address the arguments in the order raised by Vision.

(i)    *Whether the Second Amended Plan improperly provides for disparate treatment as to value?*

Vision mixes several distinct legal arguments in this subissue, namely a 11 U.S.C. § 1129(2)(b)(C)(i) argument and a 11 U.S.C. § 1123(a)(4) argument.

As to § 1129(2)(b)(C)(i), a plan satisfies that section if it:

provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed

36

liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest.

Here, the requirement was satisfied in that Vision received a note equal to the value of its interest.  Vision does not assert that there is a fixed liquidated preference or any fixed redemption price to which it is entitled that would result in a higher value.  Because § 1129(2)(b)(C)(i) was satisfied, satisfaction of § 1129(2)(b)(C)(ii) is not required.  *See* § 1129(2)(b)(C) (providing that a plan is fair and equitable with respect to a class of interests if the interest holder receives the value of the interest *or* the absolute priority rule is not violated).

Vision's reliance on § 1123(a)(4) as a basis for finding a violation of 1129(b)(C) is unclear.  As noted above, a plan is fair and equitable as far as value is concerned if the interest holder receives the value of its interest.  That has occurred here.  This Court reviews *de novo* whether there was compliance with § 1123(a)(4).  Section 1123(a)(4) requires that a plan "provide the same treatment for each . . . interest of a particular class."  Equality of treatment has two aspects: (1) "all members of the class must receive equal value," and (2) "each member of the class must pay the same consideration for its distribution."  *In re Quigley Company, Inc.*, 37 B.R. 110, 116 (Bankr. S.D.N.Y. 2007).  This Court takes no issue with the law so stated.  However, in this case every equity holder received

100% value for their shares and none were required to pay consideration to receive such value.

This Court also takes no issue with the proposition that "[t]he two primary characteristics of an equity interest are control and pecuniary benefit," *In re 4 C Solutions, Inc.*, 302 B.R. 592, 597 (Bankr. C.D. Ill. 2003), that "[e]quity interests are junior to unsecured creditors and stock is 'property' for the purposes of section 1129(b)(2)(B)(ii) even if the debtor has a negative net worth," *Id.* at 596-97 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988)), or that "[a] shareholder's retention or receipt of stock in the reorganized debtor, where a class of unsecured creditors is not paid in full, runs afoul of the absolute priority rule." *Id.* at 597.  However, these cases are grounded upon the absolute priority rule.  The absolute priority rule is not implicated in this case because the "fair and equitable" standard was met under the first prong, § 1129(b)(2)(C)(i).

 (ii) *Whether the Second Amended Plan violates the absolute priority rule?*

Vision argues that the Plan did not satisfy the absolute priority rule found in § 1129(b)(2)(C)(ii).  Debtor responds by noting that the requirements of § 1129(b)(2)(C) are provided in the alternative and that because the Bankruptcy Court properly found that the Plan satisfied 1129(b)(2)(C)(i) that it was unnecessary for the Bankruptcy Court to evaluate whether the Plan satisfied § 1129(b)(2)(C)(ii).  To the extent that Debtor advances the argument that absolute

priority rule only applies to creditors under § 1129(b)(2)(B) and does not have an analogous application under § 1129(2)(b)(C) for interest holders, this Court disagrees. *See* Richard Maloy, *A Primer on Cramdown-How and Why It Works*, 16 St. Thomas L. Rev. 1, 40-43 (2003). However, this Court agrees that § 1129(b)(2)(C) is written in the alternative. Thus, the absolute priority rule of § 1129(b)(2)(C) is not implicated here, and the Bankruptcy Court did not err in determining that because the Plan satisfied the first prong of § 1129(b)(2)(C) it was unnecessary for the Bankruptcy Court to determine whether the second prong was met.

> (iii)   *Whether the Second Amended Plan is otherwise unfair and inequitable?*

Vision argues that because § 1129(b)(2) contains the word "includes," it is clear that the Bankruptcy Court could still be deemed to fail to satisfy the "fair and equitable" requirement in § 1129(b)(2) based upon the totality of the evidence. This Court agrees that pursuant to 11 U.S.C. § 102(3), "include" is not a limiting term. However, even if the Code allows for other reasons to factor into the determination of fair and equitable, that does not mean that the Bankruptcy Court erred by not choosing to do so here in light of the circumstances before it.

> *(d)Whether the Bankruptcy Court erred in approving an inadequate interest rate to be applied to the delayed payment option offered to Vision-Park and the other disfavored equity holders?*

Vision argues that the 4.25% interest rate on the promissory notes is inadequate because it is not of a level sufficient to ensure that the equity owners receive present value of their interest.  Vision acknowledges that *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) holds that the formula method – prime rate plus a risk adjustment – is the proper method to determine the interest rate in a Chapter 13 cramdown.  While *Till* did not decide the proper scale for the risk adjustment, it noted that courts have generally approved adjustments of 1% to 3%.  Further, Vision acknowledges that Florida bankruptcy courts have repeatedly applied the *Till* analysis and the formula method to Chapter 11 cases.  *See In re J.C. Householder Land Trust #1*, 501 B.R. 441 (Bankr. M.D. Fla. 2013); *SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650, 660 (M.D. Fla. 2010).  However, Vision argues that in this case the rate should be a floating rate based upon the Wall Street Journal Prime Rate plus a premium of three percent.

The parties agree that this Court reviews the Bankruptcy Court's decision of the appropriate interest rate for clear error.  *In re Brice Development, L.L.C.*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008).  The burden of proof as to an upward adjustment to the prime rate is squarely on the creditor.  *Till*, 541 at 479.  Vision does not cite any case law where courts have used the formula method based upon a floating prime rate.  Further, in the argument section of its brief, Vision fails to

40

indicate how the Bankruptcy Court erred in allowing a 1% adjustment to prime other than to simply argue that it should have been 3%. This Court concludes that Vision has failed to demonstrate that the Bankruptcy Court clearly erred in using a rate of prime plus one.

### (e)Whether the Bankruptcy Court erred in granting Debtor's applications for 2004 examinations of Mr. Ginn, Vision-Park, SPS, and Mr. Sandel?

Vision argues that the Bankruptcy Court erred in granting the application for the 2004 examinations because it allowed Debtor to inquire into areas that went far beyond the reasonable scope of an examination of an interest holder. Vision fails to demonstrate that there is any relief this Court can provide at this juncture or that this is a basis to not confirm the Plan. Based upon what is before this Court, it appears that the examinations have already occurred and that Debtor's remaining motions for sanctions were withdrawn as a part of the conditions the Bankruptcy Court imposed for plan confirmation. *See* ECF 15, Docket 451, pp. 3-4. Thus, there is no remedy this Court can afford, nor is this a basis for reversal in this case.

### (f) Whether 11 USC § 1129(b)(2)(C) is unconstitutional as applied to the Facts in this case insofar as it sanctions the wrongful deprivation of Vision-Park's fundamental property rights?

Finally, to the extent it is preserved for appeal, this Court is not persuaded by Vision's argument that 11 USC § 1129(b)(2)(C), is unconstitutional as applied inasmuch as Vision received 100% of the value of its shares.

41

*Conclusion*

For the reasons stated above, the Bankruptcy Court's Order Confirming the Amended Plan of Reorganization of Seaside Engineering & Surveying, Inc, as Modified by the Technical Amendment to the Amended Plan is **AFFIRMED**.  The Clerk shall close the file.

**SO ORDERED on March 27, 2014.**


**s/Mark E. Walker**
**United States District Judge**